CARTER CONSTRUCTION COMPANY, INC. AND UNITED STATES FIDELITY AND GUARANTY COMPANY v. ROBBIE A. SIMS

5-6045                                                       491 S.W. 2d 50

Opinion delivered January 29, 1973
[Rehearing denied March 26, 1973.]

*Hall, Tucker & Lovell,* for appellants.

*Huey & Vittitow* and *Hardin & Rickard,* for appellee.

J. Fred Jones Justice. This is an appeal by Carter Construction Company, Inc., hereinafter called Carter, and its bonding company, United States Fidelity and Guaranty Company, hereinafter called USF&G, from a judgment entered on a jury verdict in favor of Robbie A. Sims for $66,000 in agreed advances and $15,730.20 for rental of equipment, growing out of breach of contract in connection with three construction projects.

The pertinent facts appear as follows: Carter is a corporation wholly owned by Ike Carter, Jr. Robbie Sims is an individual with considerable experience in heavy construction. Carter and Sims became acquainted with each other in connection with their construction work and in bidding on public construction jobs. In the spring of 1969 Sims had run out of work so he proposed to Carter that they join forces and bid for the contract to build the Pendleton Ferry Bridge across the Arkansas River. Negotiations between the two resulted in Carter obtaining the contract for the construction of the Pendleton Ferry Bridge, and resulted in a contract between Carter and Sims under which Sims was employed as superintendent on the Pendleton Ferry Bridge job as well as two other construction job contracts awarded to Carter. The pertinent provisions of the Carter-Sims Contract appear as follows:

> "Carter is desirous of employing Sims as a superintendant in connection with the three jobs set forth above and Sims has agreed to work for Carter as a superintendent and Carter agrees to pay Sims for his services as hereinafter set forth.
>
> Carter agrees to pay Sims 49% of the net profit on Item No. 6, A, B, C, D, E, F, G, H; Item 7 and Item 10,

as set forth in the Unit Price Schedule, Contract DACW 03-69-0044, Franklin County Job. Carter also agrees to pay Sims 49% of the net profit on the Crawford County job, if he be awarded same, for Items No. 3, 4, 5, 6, 7, 7, 10, 11, 12, 16, 17, 18 & 19, as set forth in the Unit Price Schedule on said contract, and, Carter agrees to pay Sims 49% of the net profit on the Pendleton Job after $65,000.00 of the profits from said job has been paid to Carter Construction Company, Inc. for bidding and bonding said project.

Carter agrees to advance Sims the sum of Three Thousand Dollars ($3,000.00) per month, beginning June 1, 1969, until the three jobs are completed and the advances will be deducted from the percentage of the profits due Sims.

The three jobs, for the purpose of arriving at profits and losses, will be considered as a single job and any losses that may be suffered on any individual job will be subtracted from the profits on the remaining jobs.

The $65,000.00 due Carter Construction Company, Inc. for bidding and bonding of the Pendleton Job will be paid by deducting 5% from any and all amounts received under the contract until the sum of $65,000.00 has been received by Carter Construction Company, Inc.

That the percentages due Sims over and above the $3,000.00 monthly draw will be paid to him monthly when the surplus in the banking account to be set up for this project exceeds the sum of $50,000.00.

Monthly statements of income and expenditures will be furnished Sims no later than the 10th of each month.

All equipment in connection with these jobs will be rented from the owner or owners at a price to be agreed upon by Carter and Sims and the rental price on each piece of equipment will be in writing and signed by both parties, showing the effective rental date and both parties will also agree and endorse their approval thereon showing the termination of

said rental period. All equipment rentals will be paid monthly."

Sims owned considerable bridge construction machinery and equipment, so he moved his own equipment onto the jobs and started supervising the construction under his contract with Carter. Carter paid Sims $3,000 each month for a period of three months. Carter also paid Sims $1,700 for expenses and $150 per week in salary. Carter had also made installment payments on some of Sims' equipment in the amount of $11,585.84, when on October 10, 1969, Carter terminated Sims' employment.

On December 30, 1969, Sims filed suit against Carter and USF&G alleging that he had been wrongfully discharged by Carter and alleging damages for breach of contract. Sims alleged that the net profits on the three jobs involved would have been $347,986.94 if he had been permitted to complete his contract, and that after deducting $65,000 due Carter under the contract and after deducting $12,000 he had received in advances, his share of the net profits under the terms of the contract, would have amounted to $132,783.60. He prayed judgment against Carter for loss in profit in the amount of $132,-783.60. Sims also alleged that he had rented his own equipment for use on the jobs and prayed judgment against Carter and USF&G for $58,327 for such rentals. Sims also alleged $5,000 damage as a result of having to move his equipment from the jobs after he was wrongfully discharged. By amendment to his complaint, in compliance with a motion to make more definite, Sims prayed judgment against Carter in the amount of $132,-503.47 and against Carter and USF&G in the amount of $58,328.06. A jury trial resulted in a verdict for Sims with damages fixed as follows:

| "Equipment rental | $15,730.20 |
| Loss of advance under the contract | 66,000.00 |
| Loss of profits | 00" |

Judgment was entered on the verdict against Carter and USF&G jointly and severally for $15,730.20 and against Carter for $66,000.

On appeal to this court Carter and USF&G rely on the following points for reversal:

"The court erred in giving plaintiff's requested instructions Nos. 12, 14 and 15, and in submitting a verdict form to the jury which permitted the jury to find that Sims was entitled to both profits and monthly draw.

The court erred in giving plaintiff's requested instruction No. 13.

The verdict is excessive."

The instructions complained of under points one and two appear as follows:

"No. 12 If you decide for Sims on the question of Breach of Contract, you must then fix the amount of money which will reasonably and fairly compensate him for any of the following three elements of damage sustained:

First: Equipment rental and materials furnished.

Second: Amount of draw under the terms of the Contract.

Third: Loss of profits.

Whether any of these three elements of damage has been proved by the evidence is for you to determine.

No. 13 Regardless of which party breached the contract dated May 2, 1969, you are instructed that if you find Sims furnished materials and equipment which were reasonable and necessary for the job, you should fix the amount which would reasonably compensate Sims for the fair rental value of said equipment and the fair market value of the material at the time; taking into consideration any amount paid by Carter on behalf of Sims as equipment payments.

No. 14 If you find from a preponderance of the evidence that Sims is entitled to recover from Carter un-

der the Contract the measure of the damages to Sims under the 'monthly draw' provision of the Contract should be computed as follows:

A. $3,000 per month from June 1, 1969, for each successive month until the completion of the jobs.

B. Less any amount paid by Carter to Sims as 'draw' under the contract.

No. 15 If you find from a preponderance of the evidence that Sims is entitled to recover from Carter under the contract, you are instructed that where one party to a contract is prevented from performing by the fault of the other party, he is entitled to recover profits which the evidence makes it reasonably certain he would have made had the other party carried out his contract.

In this connection, you are instructed that if you find that Sims is entitled to be awarded damages for loss of profit, you will take into consideration all those items chargeable to Sims under the terms of the contract entered into by the parties on May 2, 1969."

At the close of the case the court instructed the jury as follows:

"Gentlemen, you will now retire to deliberate. You will return one of two forms of verdict:

'We the jury find for the plaintiff and fix his damages as follows: Equipment rental' and there is a blank for you to insert a figure if you believe he is entitled to recover for rental of equipment; 'Loss of Advance under the Contract and Loss of Profits' and there you will insert a figure if you believe there was a loss. It is not necessary or required that you return a figure for each line item. You figure each individually and make your determination."

The jury necessarily found that Carter breached the employment contract in the discharge of Sims and that finding is not questioned on this appeal. Both parties testified that they abandoned or waived the provision of their written contract relative to the rental of equipment

so we hold, without further comment, that the trial court did not err in giving instructions Nos. 12 and 13 as those instructions relate to equipment rental and materials furnished. There was substantial evidence to support the jury verdict on this item. It would appear from the wording of instructions 12, 14 and 15, as they relate to both monthly draw and loss in profit, that these instructions do permit the jury to erroneously award double damages and recovery to Sims in the form of monthly draws in addition to 49% of the net profits under the contract. This error was rendered harmless, however, by the jury's finding that Sims sustained no damages because of loss in profits. There is a conflict in the evidence as to whether a profit was derived or a loss sustained upon completion of the three construction projects. Carter said there was a loss and that the loss would have been greater if Sims had been permitted to continue on the job. Sims said there was a profit and that the profit would have been greater had he not been discharged.

It appears from the overall testimony of Sims and Carter that their initial preliminary negotiations contemplated the possibility of entering a joint venture in connection with the Pendleton Ferry Bridge job. Sims apparently had the heavy construction equipment, the experience and know-how necessary for the successful completion of such large bridge construction job, and Carter had the financial backing and reputation necessary for insuring and bonding such undertaking. Be that as it may, however, Carter and Sims actually did enter into a master and servant employment contract providing that Carter would advance to Sims $3,000 per month until the jobs were completed, said advancements to be deducted from the percentage of the profits due Sims under the terms of the contract. The employment contract was silent as to the payment or refund of advances in the event no profits were realized upon completion of the construction.

In the 1962 Louisiana case of *Landry* v. *Huber,* 138 So. 2d 449, 95 ALR 2d 499, the facts were almost on all fours with those in the case at bar. In that case Huber owned and operated a claims investigation service and in connection with opening a branch office in Beaumont, Texas, he entered into a written contract with Landry

under the terms of which Landry was to manage the Beaumont office and his compensation was to be based on one-half of the net profits of the Beaumont office. The contract also provided that Landry was to be paid a drawing account of $450 per month which was to be deducted from the share of the net profits he was to receive as compensation. Huber terminated the contract on December 23, 1959. Landry had been paid his drawing account as stipulated in the contract up to November 15, 1959, but Huber refused to pay him any compensation between November 15 and December 23, contending that the drawing account was only an advance on Landry's share of the net profits and since there was no net profits he was not liable on the drawing account. In affirming a judgment for Landry, the Louisiana Court of Appeals, 3rd cir., said:

> "It is well settled that an excess of advances to an employee over the actual commissions or profits earned, from which the advances are to be deducted, cannot be recovered by the employer (Southern Molasses Co. v. Boutcher, 172 La 691, 135 So 27; Bardwell v. Szatmary, La App 2 Cir. 99 So 2d 420; A Gagliano v. Clark, La App Orl. 63 So 2d 252; Karno's v. Schneider, La App Orl. 39 So 2d 851; Lawton v. Scott, La App 2d Cir. 29 So 2d 614; American Furniture Co. v. Snell, La App 2d Cir. 164 So 478); in the absence of an express or implied agreement of the employee to repay such excess (Rex-Metallic Casket Co. v. Gregory, La App 2 Cir. 115 So 2d 639, certiorari denied; McCardle v. Nagim, La App Orl. 61 So 2d 267). See also Annotation, 'Personal liability of servant or agent for advances in excess of commissions earned,' 57 ALR 33, supplemental 165 ALR 1367."

The Louisiana court recognized that the decisions it cited concerned the converse of the situation in *Landry*, but the court in *Landry* then said:

> "Unless the parties had agreed otherwise, the courts thus treat a drawing account as being in the nature of a guaranteed minimum compensation for the services of an employee, rather than as being a loan against the commissions or profits to be earned. The trial

court held, correctly in our opinion, that the same principle is applicable to the present case, where an employee sues to recover the unpaid drawing account which the defendant employer had agreed to pay him during his employment.

Other than the cited cases concerning the converse of the present situation, there is no Louisiana case directly in point. However, a majority of American jurisdictions passing upon the question have reached the same conclusion as we do: In the absence of contrary agreement, a contract to pay an employee a specified sum periodically, which is to be charged against future commissions or profits, entitled him to recover this drawing account during entire term of the contract, regardless of the commissions or profits earned."

In *Agnew* v. *Cameron*, 55 Cal. Rptr. 733, a salesman's contract with a neon sign company was involved and in that case the California Court of Appeal, Fourth District, said:

"The majority rule in the United States is when the contract of employment provides for advances to the employee, which are to be deducted from commissions earned, as the same may accrue, the employer cannot recover excess advances from the employee in the absence of an express or implied agreement or promise to repay any excess of advances made over commissions earned. [Citing numerous cases from numerous states].

The rationale for the existence of the majority rule is that the employee's undertaking is in the nature of a joint enterprise with the employer, the main object of which is the furtherance of the employer's business, and it is not to be assumed that the employee, in furnishing his time and ability, likewise assumes all the risk."

In 56 C.J.S. Master and Servant, § 95, is found the following:

"Under a contract providing for an employee's share of the net profits and a drawing account of a

fixed sum payable periodically, the drawing account is payable absolutely."

See also *Joseph Toker, Inc.* v. *Cohen,* 169 A. 2d 838.

Returning now to the case at bar, the record is not clear as to when the three jobs were completed in this case. The record indicates, however, that the largest job, the Pendleton Bridge job, was accepted by the state on May 28, 1971, which was three days short of two years from the date the monthly payments of $3,000 were to begin under the contract. We are unable to determine how the jury arrived at its verdict of $66,000 due Sims as loss of advance under the contract. The maximum time and amount for which Carter could have been liable under the $3,000 monthly advancement provisions of the contract and under the evidence adduced at the trial, amounts to not over 24 months at $3,000 per month, or a total of $72,000. Of this amount $12,000 was paid to Sims, leaving a balance of only $60,000 as the maximum amount Sims could recover under the terms of this provision of his contract and under the evidence in this case. The evidence is clear that Sims was also paid a weekly salary of $150 for a period of 24 weeks from May 10, through October 18, in the total gross amount of $3,600.

We are of the opinion, therefore, that there is no substantial evidence that Sims sustained damages in the loss of unpaid monthly advancements or draws for more than 20 months in the total amount of $60,000. We are also of the opinion that Carter is entitled to credit for the salary paid Sims in the amount of $3,600. The judgment is affirmed on the condition that a remittitur in the amount of $9,600 is entered within 17 calendar days; otherwise the judgment will be reversed and this cause remanded for a new trial on the issues.

Affirmed upon remittitur.

HARRIS, C.J., and BROWN and BYRD, JJ., dissent.

CONLEY BYRD, Justice, dissenting. For the reasons hereinafter stated, I disagree with so much of the majority opinion as treats the $3000 per month advance as salary.

In the first place the parties conducted themselves toward one or the other more in the relationship of prime contractor and subcontractor than they did as master and servant.[1] The record shows that appellee had some two to three hundred thousand dollars worth of equipment with offices in Farmersville, Louisiana and Warren, Arkansas. At the time here involved, appellee had other jobs of his own going at the same time that he was also supervising.[2] The proof shows that appellee not only used his equipment with the same discretion he would have used as an independent contractor but that he also used and hired as employees the people who had worked for him over the years. In fact, M. G. McLemore[3] testified that he had worked for appellee since 1958, and that appellee hired him to work on the Crawford County job.

Furthermore, the contract, while describing appellee as "a superintendant in connection with the three jobs," recognizes that appellee can use his equipment on the jobs and by our ruling today we have recognized that appellee was entitled to the fair rental value thereof.[4]

Thus we have an agreement in which appellee used his equipment but at the same time continued to work on his own job. Consequently, I cannot apply the laws applicable to the master and servant relationship where the employee is expected to give his full time to the master's services.

The cases recognize a distinction between an independent contractor such as a manufacturer's representative and an employee who devotes his full time to his master's services. See *Argonaut Builders* v. *Dare,* 145 Colo. 424, 359 P. 2d 366 (1961) and *Strauss* v. *Cohen Bros. Co.,* 169 Ill. App. 337 (1912).

In *Argonaut Builders, supra,* Dare had been engaged in soliciting building and remodeling contracts whereby he received 60% of the profit. The trial court

---

[1]Neither the trial court nor this court found any trouble in treating the contract as amended to conform to the conduct of the parties on the equipment rental.

[2]Record page 152, appellant's abstract page 50.

[3]McLemore and appellee married sisters.

[4]Appellee testified that he fixed the rental from a book used by the rental people, just like anybody else would rent it.

ruled at the close of Argonaut's case that it could not recover advances made in excess of profits realized by Dare. In reversing the case the Colorado Supreme Court ruled that under the evidence presented it appeared that Dare was an independent contractor rather than an employee and that if such should be found to be true, Argonaut would be entitled to recover. In so ruling, however, it said:

"The general rule, on which the trial court based its decision and on which the defendant relies here, is that where a contract of employment provides for advances to the employee to be charged to and deducted from the commission agreed upon as the same may accrue, the employer cannot, in the absence of an express or implied agreement or a promise to repay any excess of advances or commission earned, recover such excess advances from the employee. Numerous cases supporting this doctrine are collected in 165 A.L.R. 1367 in a note on *Sutton* v. *Avery,* 132 Conn. 397, 44 A. (2d) 701, and also in 57 A.L.R. 33. It would seem from the cases referred to and an analysis of the rule reported in 56 C.J.S. 561, *Master and Servant,* Sec. 120c, that the basis for the doctrine is that the payments are made in regular amounts in consideration of continued activity by the employee and are thus in the nature of salary or wages. Because of this regularity of payment and the requirement that the employee give his full time to the employment, the presumption arises that the advances are recoverable only from commissions and thus the excess cannot be collected by the employer."

In *Strauss* v. *Cohen Bros. Co., supra;* Strauss as a traveling salesman handled not only the Cohen Bros.' line of merchandise but also a different line of merchandise of one Monarch. His contract with Cohen Bros. provided:

"In consideration of the good and faithful performance of said duties by the party of the second part (Strauss) he at all times fully complying with the instructions of party of the first part, said Cohen Bros. Co. agrees to advance to the second party from time to time as may be necessary, reasonable traveling expenses and to further advance to second party

on the first of each month, commencing with the second month of this contract, and continuing while same shall be in force between the parties, the sum of $100.00—One Hundred Dollars with the understanding that the sum of such advances for any year shall not exceed (--) per cent of the sales of said second party; and if at the close of the year's shipments, the amount shown by computing--per cent on the sales of said second party, shall show an excess over and above the sum of moneys advanced by first party for traveling expenses, together with the drawing account, then any such excess sum shall be paid to second party by first party."

The court construed this contract as purely a commission contract and in so doing construed the word "advance" in its common acceptance as: "To advance is to supply beforehand; to loan before the work is done or the goods are made." In so doing the court reversed a judgment in favor of Strauss. Illinois, however, recognizes and applies the rule of law upon which Strauss relied for affirmance—see *Eagle* v. *Hoffman*, 258 Ill. App. 234—where the services rendered are exclusively those for the master.

Furthermore, I do not agree that the reasoning in the case of *Landry* v. *Huber*, (La. App.) 138 S. 2d 449, 95 A.L.R. 2d 499 (1962), should be adopted by this court. The reasoning there is somewhat syllogistic.[5] The court there reasons that if advances to an employee in excess of commissions cannot be recovered, then such advances must be wages or salary and it therefore follows that such advances must be made in the absence of commissions during the entire term of the contract. When we remember that, in dealing with such cases, we are interpreting a contract between the parties, it at once becomes obvious that the court in the *Landry* case overlooked the real reason for denying a recovery for excess advances over commissions—i.e., that there is an implied agreement that the advances are to be paid only from commissions and that no personal liability is to be incurred. See *Argonaut Builders* v. *Dare, supra,* and *Hibbs-Kiefer Hat Co.* v. *Schneiderhan*, 236 Ky. 470, 33 S.W. 2d 304 (1930).

---

[5]Because of the terms of the contract involved in Landry I agree with the result there reached.

In denying a recovery for excess advances to be charged against commissions in *Hibbs-Kiefer Hat Co. v. Schneiderhan, supra,* the Kentucky court said:

"No contract can be implied under which personal indebtedness will be created, for the express contract alleged in this petition is that those sums were to be deducted from the commission which the employee might earn. There is no reference to any personal liability. The sole source of reimbursement was the commissions. It was the belief of the parties that these would be sufficient, not only to reimburse the companies, but to compensate the salesman in addition. To that extent the enterprise was in the nature of a joint speculative adventure from which both parties expected to profit. Not unlike in principle is the case of *Fox* v. *Buckingham, Trustee,* 228 Ky 176, 14 S.W. 2d 421, in which it was held that a party undertaking to satisfy certain obligations out of the proceeds of oil wells to be developed by him was not personally liable where the particular fund was not realized, unless the failure of realization was due to his negligence or inactivity. So it is in this case that the contract limits the right of recovery of sums paid for traveling expenses and as a drawing account to a particular fund to be realized in a particular way. The agreement permitting a deduction of the advancements cannot be enforced, since that fund or a sufficiency was not realized, and no recovery can be held of the employee personally, since there is nothing to show that such failure was attributable to any action or inaction on his part."

Consequently it does not follow as a matter of logic that an agreement to make advances is an agreement to pay a salary. In any view the agreement to advance here is nothing more than an agreement to loan against anticipated profits. As an independent contractor, appellee has no right to recover more than the profits he expected to make and would be liable, had appellant prayed for the repayment, for the advances made. As an employee he is not entitled to be loaned more than his part of the profits. It follows that I consider instruction No. 14 erroneous.

For the reasons herein stated, I would reverse and remand for new trial.

HARRIS, C. J., and BROWN, J., join in this dissent.