**AMHERST SPORTSWEAR COMPANY, INC., Plaintiff, Appellee,**

v.

**Mark McMANUS, Defendant, Appellant.**

No. 88–2193.

United States Court of Appeals,
First Circuit.

Heard April 3, 1989.

Decided June 5, 1989.

David A. Ross with whom Ross & Ross, Manchester, N.H., was on brief, for defendant, appellant.

Sterling H. Schoen, Jr., Manchester, N.H., on brief, for plaintiff, appellee.

Before CAMPBELL, Chief Judge, BOWNES and BREYER, Circuit Judges.

LEVIN H. CAMPBELL, *Chief Judge.*

Defendant McManus, a former sales representative for plaintiff Amherst Sportswear Company ("Amherst"), appeals from a judgment of the United States District Court for the District of New Hampshire ordering him to repay $13,185.40 that Amherst had advanced to him towards expected commissions which he failed subsequently to earn. We vacate the judgment below and remand.

Amherst is engaged in the design, marketing and distribution of women's sportswear. In August 1982 McManus agreed to act as Amherst's sales representative in four states. The following year McManus and Amherst entered into a letter agreement dated June 20, 1983, written by Amherst's president, Ted Gillan, and sent to McManus. The letter provided:

> We have agreed that you will be a [regional] Sales Manager.... You have agreed to represent AMHERST SPORTSWEAR CO., INC. exclusively. The commission on your sales will be 8% on regular price shipments and 4% on off-price shipments less market terms.... You will maintain showrooms at your expense in the Charlotte Merchandise Mart and the Atlanta Apparel Mart.... AMHERST will advance you a monthly draw of $3,000.00 towards expected commissions. AMHERST will pay for your Medical and Dental Plan for one (1) year. Mark, please review this agreement and alert me as to any questions you might have....

Per the agreement, Amherst began in June to advance McManus $3,000 per month. Each month Amherst sent McManus a so-

called "commission statement" showing the accumulated commissions McManus had earned, the accumulated monthly "draw" advanced to him, and the running balance as between these two items. As McManus did not meet his projected sales, the commission statement by December 1984 showed advances to McManus exceeding his earned commissions by $19,000. This latter net figure appeared in brackets. Gillan and McManus met several times and discussed the fact that the advances were far outpacing the commissions due to McManus. In March 1985 Gillan agreed to write off half of the advances so far made to McManus as a gesture of faith in McManus's ability. This transaction was memorialized in a memo to McManus from an Amherst accountant, which provided, "As you can see, Ted has agreed to write off half of your advance effective with this [commission] statement." McManus verbally thanked Gillan for writing off the advances. Sometime in the spring of 1985 Amherst reduced McManus's advances to $1,000 per month. When matters did not improve, in November 1985 Amherst terminated McManus's advances. McManus voluntarily severed his relationship with Amherst the following January. At that time, McManus's debit balance was $13,185.40. Gillan testified that at the time McManus left, Gillan asked McManus what he intended to do about the debit balance, and that McManus said something to the effect that he would pay the debt.[1] McManus denied having promised to repay Gillan, testifying that the final meeting was heated and that

he only told Gillan that if Gillan wanted to talk further, he could contact McManus at his home.[2] McManus testified that Gillan did not contact him again.

Amherst then brought this diversity action to recover the debit balance, Amherst being a New Hampshire corporation with its principal place of business there, and McManus a North Carolina citizen. The parties agreed that the substantive law of New Hampshire would apply. *See Moores v. Greenberg*, 834 F.2d 1105, 1107 n. 2 (1st Cir.1987) (where parties agree what substantive law applies, federal court sitting in diversity jurisdiction should comply). On the basis of the evidence at the bench trial, the district court found that

> Mr. Gillan sent McManus a letter dated June 20, 1983, outlining the agreement between the parties, including a provision that "Amherst will advance you a monthly draw of $3,000 towards expected commissions." Although Gillan asked McManus to review the letter agreement and advise him if there were any questions, McManus never disputed the terms set forth therein during the time he worked for Amherst.

The court also found that McManus was an independent contractor. Further, the court found that

> [o]n April 25, 1985, Amherst issued a memorandum confirming an earlier conversation between Gillan and McManus in which Gillan told McManus that Amherst would forgive one half of the accumulated debit balance. McManus

---

1. Gillan's testimony at trial included the following:

   A. On my phone call I asked Mark: Mark, you owe me a lot of money. What are you going to do about it? You're leaving me out in the cold. He told me: Ted, don't worry about it. I'm going to take care of it, and I'll get back to you. And I haven't heard from him since. This is the first time I've seen him in three years.

   Q. In that last conversation did he say to you: Ted, I don't owe you anything, or words to that effect?

   A. Not at all. He admitted there was debt. He admitted that.

   THE COURT: He's testified that he said don't worry about it, I'm going to pay it.

   THE WITNESS: That's correct.

2. McManus testified as follows:

   THE COURT: Did he [Gillan] state to you: Mark, you owe me money and you said—did you not say: Don't worry about it, I'll pay it?

   THE WITNESS: I don't know if those were the exact words, sir. It ended up in a—not a confrontation, but a heated area where I felt it was best for me to leave at that time, and I told him I would get back to him, or he could get back in touch with me. I did not hear from him any—

   THE COURT: Did you say you would pay him?

   THE WITNESS: No, sir.

   THE COURT: What was said?

   THE WITNESS: I said: Ted, you know where I live. You call me if you want to talk to me.

thanked Gillan for doing so. At no time prior to April 25, 1985, or during his conversation with Gillan concerning the reduction in his debit balance did Mc-Manus ever deny the existence of a debit balance, other than to occasionally question specific charges and/or credits.

The court also found that

[a]t no time prior to his termination did McManus claim that he was not required to repay the accumulated debit balance. McManus now claims that from April 25, 1985, to the date of his termination he regarded the advances as salary. There is no credible evidence that the advances made to McManus were ever salary; to the contrary, all of the evidence indicated that the advances were, in essence, loans made as advances against commissions which were to be earned in the future. McManus voluntarily quit his position as an independent sales representative for Amherst in January 1986 without prior warning to Amherst. By his own voluntary act, McManus disabled himself from repaying Amherst out of commissions.

The district court ruled that "[w]here an independent sales representative fails to question the existence of a debit balance which appears repeatedly on his monthly commission statements," and where he "disables himself from repaying a debit balance from commissions by terminating his relationship with the payor . . .," "he is obligated to repay the excess of the advances made over the commissions actually earned." Accordingly, the court ruled that McManus must repay Amherst the entire debit balance due at the time McManus terminated the parties' relationship.

In this appeal, McManus contends that the district court applied an incorrect rule of law. McManus urges that, although New Hampshire courts have not yet ruled on this question, the district court should have applied the majority rule in the United States, which is that in the absence of an express or implied agreement to repay any excess of advances over commissions earned, a principal may not recover from his agent the amount of the excess. *See Agnew v. Cameron*, 247 Cal.App.2d 619, 55 Cal.Rptr. 733, 735–36 (1967) (citing cases).

The legal relationships relative to this rule are discussed in the *Restatement (Second) of Agency:*

> Upon termination of the relation, the agent is under a duty to account for all he has received on behalf of the principal and to return to the principal anything which is then due to him. If an agent has received advances from his principal in anticipation of salary or commissions to which he does not subsequently become entitled, he is under a duty to repay such to the principal. Whether or not money given by a principal is given as an advance and is to be repaid by the agent in the event that his commission or other compensation does not amount to the sum advanced, is dependent upon the interpretation of the contract between them.

*Restatement (Second) of Agency* § 382 comment d (1958).

> [While the Restatement recognizes] that the issue is one of interpretation of the contract between the parties, [it] takes no position on whether, in construing the contract, there is a presumption in favor of the agent. However, the overwhelming preponderance of case law is to the effect that while the parties may provide in the agreement for personal liability, in the absence of language, or at least some evidence, indicative of such an intention, it will generally be presumed that no liability was intended, and that the principal's sole source of reimbursement was intended to be the fund [of anticipated commissions].

Annot., *Personal Liability of Servant or Agent for Advances or Withdrawals in Excess of Commissions Earned, Bonus, or Share of Profits*, 32 A.L.R.3d 802, 806 (1970). Thus, in the absence of evidence of intention to the contrary, most state courts have treated advances on future commissions as if they were in the nature of salary, especially if the advances were made in regular amounts and the agent was required to give full attention to the principal's business interests. *Agnew*, 55 Cal.Rptr. at 735–36; *Argonaut Builders,*

*Inc. v. Dare,* 145 Colo. 424, 359 P.2d 366, 367 (1961).

> The rationale underlying this rule is that the [agent's] undertaking is in the nature of a joint enterprise with the [principal], the main object of which is the furtherance of the [principal's] business, and it is not to be assumed that the [agent] in furnishing his time and ability to the enterprise takes all the risk.

*Perma–Home Corp. v. Nigro,* 346 Mass. 349, 191 N.E.2d 745, 747 (1963) (citing *Shaler Umbrella Co. v. Blow,* 199 Wis. 489, 491, 227 N.W. 1, 2 (1929)). The parties' characterization of the funds as a "loan" or an "advance" has been held as not determinative of the agent's liability to repay a debit balance, because such terms do not clarify whether the parties intended the agent to repay excess advances from any fund other than the commissions actually earned. Annot., *supra,* at 826–32 (collecting cases).

There is no reported case in the State of New Hampshire dealing with this issue. In the absence of controlling state law, a federal court should choose the rule that it believes the state's highest court is likely to adopt in the future. *Kathios v. General Motors Corp.,* 862 F.2d 944, 949 (1st Cir. 1988); *Moores v. Greenberg,* 834 F.2d at 1107 n. 3. In so doing, "the federal court may consider all available legal sources, including the Restatements of Law, treatises, law review commentaries, decisions from other jurisdictions whose doctrinal approach is substantially the same, and the 'majority rule.'" 19 C. Wright, A. Miller & E. Cooper, *Federal Practice & Procedure* § 4507, at 100–03 (1982) (footnotes omitted). We believe New Hampshire would most likely adopt the majority view, which is the rule in neighboring Massachusetts, as well as around the nation. *See Perma–Home Corp. v. Nigro,* 346 Mass. 349, 191 N.E.2d 745 (1963).

Since, therefore, the applicable law presumes that the agent is not personally liable to repay advances absent a showing of a contrary intention, the lower court should have started with this premise. The court did not, however, refer to this principle in its opinion. Rather, the court's opinion seems to take the opposite view—namely, that absent evidence of a contrary understanding, McManus had to pay back the advances. Because the court proceeded on an erroneous legal premise, we vacate and remand.

Amherst defends the district court's decision on several grounds.

First, it argues that McManus's counsel misled the district court by failing to argue below the position he now advances on appeal, to wit, that the law furnished McManus, as Amherst's agent, with a rebuttable presumption against liability for repayment of the advances other than from commissions. We have carefully scrutinized defendant's pretrial statement and trial memorandum and find that, in each, this issue was clearly asserted with citations to supporting authorities. The point was not perhaps expressed at trial as clearly as it might have been. Had this occurred, the able district court judge doubtless would have given greater attention to it. We cannot say, however, that McManus's counsel failed to raise the point. We must, therefore, address it.

Amherst next argues that the presumption in favor of agents applies only to employees, not to independent contractors such as the court found McManus to be. Amherst points to a decision by the Supreme Court of Colorado which, while acknowledging the rule favoring agents, found that evidence of the parties' dealings showed that defendant might be more like a "contractor" than an "employee," and that, if so, the evidence was sufficient to overcome the presumption that the agent was not liable to repay excess advances. *Argonaut Builders, Inc. v. Dare,* 359 P.2d at 367–68. From this case and a dissent in a 1973 Arkansas case,[3] Amherst reasons that the district court's finding that Mc-

---

**3.** *Carter Construction Co. v. Sims,* 253 Ark. 868, 491 S.W.2d 50, 56–58 (1973) (Byrd, J., dissenting) (dissenting on ground that defendant was an independent contractor and should not have benefited from presumption in favor of agents) (citing *Straus v. Cohen Bros. Co.,* 169 Ill.App. 337 (1912)).

Manus was an independent contractor destroyed any presumption in favor of his retention of the advances.

We do not agree that the presumption turns on a narrow, mechanical determination of whether, within agency parlance, the agent was an "employee" rather than an "independent contractor." To be sure, contractor status along with other factors may be significant. The presumption ordinarily is applied to parties whose relationship is "substantially one of employment, and in which the 'principal' has made advances in excess of commissions earned." Annot., 32 A.L.R.3d at 805 n. 2. Courts generally have *not* applied the presumption in cases "which deal with liability of independent contractors for funds advanced against charges for work to be performed ... or with similar situations, unless the relationship is essentially one of employment." *Id.* However, an exclusive sales agent like McManus, even if not strictly speaking an "employee," was seemingly in a relationship substantially of employment.[4] The cases applying the presumption are not limited to "employees" in the strict sense; rather they cover relationships variously termed as principal and agent, or company and salesman, as well as master and servant. Independent contractors as well as employees can be agents. *Restatement (Second) of Agency*, § 2 (1958). In *Pesanelli v. Lombardi*, 349 Mass. 250, 207 N.E.2d 683 (1965), the Massachusetts court applied the presumption to an agreement specifying that defendant was "an associate and not an employee or partner of the plaintiff," where advances had been made with regularity.

The purpose of the presumption is to fill a void in understanding where one who devotes himself to the service of another has, for reasons that may or may not be attributable wholly to himself, failed to generate commissions sufficient to cover the advances upon which he has depended to live. The justification for treating the advances like a salary is that the agent has been furnishing time and ability in further-

ance of the principal's business; because of this, it has seemed fair to most courts to regard the advances—absent agreement—as a kind of guaranteed minimum compensation for services rendered. That justification obviously fades the more the agent looks like a contractor engaged in a business transaction rather than in a relationship that is "substantially" one of employment. The former was the situation in *Argonaut Builders*, 359 P.2d at 367–68, where the nature and circumstances of the joint enterprise overcame the presumption. In that case the court recognized the presumption at the outset, but concluded that particular facts (which were less indicative of an employment relationship than here) would indicate that the parties had manifested an intention that the defendant repay excess advances.

A third argument for Amherst can be derived from the lower court's ruling that "[w]here an independent contractor disables himself from repaying a debit balance from commissions by terminating his relationship with the payor, he is obligated to repay the excess of the advances over the amount of commissions actually earned." As a full statement of the law, however, that assertion was not correct. "[A] voluntary departure from employment does not in itself necessarily render the agent liable." Annot., *supra*, at § 13[a] (citing cases). Rather, in the absence of an express or implied agreement to repay, a departing agent may be liable in circumstances

> when the agent, bound by the contract to give his best efforts to promote his principal's business interests until the end of the term of employment, wrongfully abandons, or by breach in effect abandons, the contract before the expiration of the term ... on the theory ... that to allow him to keep the advances would be to permit him to profit by his own wrongdoing.

*Id.* See, *e.g., Gibson v. J.T. Allen Agency,* 407 P.2d 708 (Wyo.1965) (agent liable to

---

**4.** In so saying, we do not mean to rule finally that McManus's relationship was substantially one of employment. As the case will be retried, we leave the matter open for resolution by the district court on remand.

repay where he left employment in order to escape repayment of the amounts advanced to him).

It is not presently clear to us that McManus terminated his relationship with Amherst in violation of the agreement between the parties. Nor can it be said that McManus necessarily failed to give his best efforts to sell Amherst's products, or that his poor sales record was due to his own lack of diligence or bad faith, rather than some other factor. We know only that McManus failed to generate enough commissions to offset the advances, and that he left after Amherst had decreased his advances to $1,000 per month and then ceased providing the advances altogether. While the absence of sufficient commissions may have been due to a lack of diligence, it is also possible that McManus was working loyally but that consumer resistance, competition, a poor product, or other factors rendered his efforts futile. On the present record, and without an explicit finding, we cannot say that a judgment for McManus would allow him to profit from his own "wrongdoing."

We are thus left with a judgment for Amherst rendered by a court that appears to have held an erroneous view of the controlling law. If we knew that the court had recognized the principles discussed above and had nonetheless found that the facts and circumstances manifested an intent for McManus to repay, we would be tempted to affirm. The court's findings are, however, silent as to such an agreement to repay, and the court makes no mention of any presumption favoring an agent but rather seems to assume, without more, that one in McManus's shoes begins with a legal obligation to repay the advances. Similarly, the court seems to have believed that McManus's departure was, by itself, indicative of personal liability, rather than determining whether McManus had failed to give his best efforts or had wrongfully abandoned his position.

The district court found, to be sure, that the monthly payments were "*loans* made as advances against commissions which were to be earned in the future" (emphasis supplied). This does not demonstrate, however, that the court necessarily considered what the parties intended if the commissions were *not* earned in the future. *See Perma–Home Corp. v. Nigro*, 364 Mass. at 354, 191 N.E.2d at 748 (factual finding that the "advancements were in the nature of [a] loan to be repaid the plaintiff ... [in] the amount in excess of commissions earned" was not sufficiently clear to indicate whether the trial court had applied the majority rule or an alternative, and erroneous, rule of law). Nor does the finding that McManus thanked Gillan for writing off half his debit balance dispose of the question. There is no dispute that the debit balance was a charge against future commissions; for that reason alone McManus had good reason to thank Gillan for writing off half the advances. The write-off halved the commissions McManus had to earn before he could keep any commissions for himself. His thanks, therefore, did not necessarily prove that he recognized a personal indebtedness to Amherst.

The district court's findings, indeed, suggest that the district court may mistakenly have believed that someone in McManus's position was presumptively indebted to his principal, rather than being the beneficiary of the favorable presumption accepted by most courts. Thus, instead of analyzing whether Amherst had provided sufficient evidence to overcome the presumption that the parties did not intend McManus to repay excess advances, the district court's findings indicate that, because the letter agreement indicated that the monthly payments were to be "advanced," the court looked to *McManus* for rebuttal evidence. The court relied heavily on its findings that McManus *provided no evidence* that monthly payments were salary,[5] and that McManus never questioned the debit balance or claimed that he was not required to

---

5. Because we find it necessary to remand this case for a new trial, we do not reach McManus's alternative argument that the district court erred in finding that "there is no credible evidence that the advances made to McManus were ever salary." McManus lists in his appellate brief the evidence at trial indicating the contrary.

repay the debit balance. Even if these findings addressed the central question of whether there was an express or implied agreement to repay excess advances—and we express no opinion on whether they do—they are framed as if McManus was responsible to prove that the advances were salary, rather than as if Amherst bore the burden of proving the existence of an agreement that McManus would repay.

We recognize that there is some evidence which might support a determination of an agreement. Ted Gillan, Amherst's president, testified that he and McManus met three times per year and that at each of these meetings, he would say to McManus, "Mark, you owe me money." He also testified that the monthly commission statements constituted a demand for payment (although the statements were in no way framed as such, being merely entitled "commission statement" and showing running balances). *See* Annot., *supra*, at § 11 (some courts have considered agent's failure to question monthly statement showing debit balance as evidence of an implied agreement to repay excess advances). Gillan also testified that McManus promised upon leaving the company to pay the debit balance. However, this testimony was contradicted by McManus, and the district court made no finding to resolve the conflict. Further, much of the evidence at trial indicated that the parties' dealings with regard to the method and timing of repayment were vague, indicating the absence of an agreement. The term "advance" in the letter agreement is subject to contradictory interpretations. *See, e.g., Insurance Management of Washington, Inc. v. Guthrie,* 310 A.2d 61, 64 (D.C.App.1973) ("the fact that the $500 payments were labeled "advances" does not signify that they were loans rather than salary payments.") (citing *Mutual Life Insurance Co. v. Mooney,* 108 N.Y. 118, 15 N.E. 303 (1888); *Richmond Dry Goods v. Wilson,* 105 W.Va. 221, 141 S.E. 876 (1928)). Similarly, Gillan's statements to McManus that "you owe me money" could conceivably be interpreted to mean "you must earn more in commissions," rather than "return the money now." Whether the parties agreed

McManus would repay excess advances is essentially factual. Because determination of this fact turns on a determination of the credibility of the witnesses and inferences drawn from facially ambiguous circumstances, and because the lower court's findings do not address these factors but rather manifest, in part at least, an incorrect view of the law, it is necessary for us to remand to the district court for a new trial, where evidence can be heard and new findings made in light of the rule of law we ascribe to New Hampshire.

*The judgment of the district court is vacated and the case remanded for a new trial.*